FILED

2005 Sep-30  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAURA CAIN, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CASE NO. CV 03-B-2733-S |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA AT BIRMINGHAM; VAXIN, | ) ) ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OF DECISION

The court has before it the January 31, 2004 motions of defendants the Board of Trustees of the University of Alabama ("the Board") and Vaxin for summary judgment. Pursuant to the court's February 2, 2005 order, the parties argued the motions on April 12, 2005, and they were deemed submitted. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court holds that defendants' motions for summary judgment are due to be granted.

### I. Procedural History

Plaintiff Laura Cain commenced this action on October 6, 2003 by filing a complaint in this court alleging violations of Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000e, and state law.[1]  After amending her complaint, plaintiff contended that the alleged conduct of the Board and Vaxin constitutes sexual harassment, gender discrimination, and retaliation.  The Board and Vaxin filed separate motions for summary judgment.  Both assert that plaintiff's claims fail as a matter of law.

All parties have filed briefs and submitted evidence in support of their respective positions.  Both the Board and Vaxin has submitted a brief and evidence[2] in support of their respective motions for summary judgment on January 31, 2004.  On February 22, 2005, plaintiff filed a brief and evidence[3] in opposition to both defendants' motions for

---

[1] Plaintiff concedes her state law battery claims against both the Board and Vaxin in her brief in opposition to summary judgment.  (Pl. Br. at 1 n.2.)

[2] The Board submitted the following evidence in support of its motion for summary judgment: Third Amended Complaint; plaintiff's notes; Vaxin notice regarding search associate, Laboratory Manager; January 2, 2003 EEOC Charge; April 28, 2003 EEOC Charge; May 10, 2002 Performance Appraisal; November 2, 2003 Performance Appraisal; excerpts of plaintiff's deposition.   Vaxin submitted the following evidence in support of its motion for summary judgment: plaintiff's deposition and selected exhibits; deposition of Dr. Kent R. Van Kampen and selected exhibits; deposition of Dr. De-Chu C. Tang and selected exhibits; declaration of Dr. Kent R. Van Kampen.

[3]  The plaintiff submitted the following evidence in opposition to the motions for summary judgment: May 2002 UAB Performance Appraisal; November 2002 UAB Performance Appraisal; e-mail from Dr. Tang to plaintiff regarding Bob King; Charge of Discrimination; Vaxin sexual harassment training notes; March 6, 2003 Vaxin memo regarding informational meeting; July 15, 2003 memo to personnel files of Felix Siegel and Robert King; and June 6, 2003 memo to plaintiff from Felix Siegel regarding following policies.

summary judgment.  On March 4, 2005, Vaxin filed a reply brief and further evidence;[4] the Board did not reply.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law identifies which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See

---

[4] Vaxin submitted the following evidence in reply: second declaration of Dr. Kent R. Van Kampen with attached exhibits; and UAB, The University of Alabama at Birmingham, Fast Facts, http://main/uab/edu/show.asp?durki=66418, as visited on March 3, 2005.

3

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine
"if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not
significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its
initial burden depends on whether that party bears the burden of proof on the issue at trial.
See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property,
941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof
at trial, then it can only meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine issue of material fact; i.e.
facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick,
2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the
non-moving party to produce significant, probative evidence demonstrating a genuine
issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its
initial burden on summary judgment in either of two ways.  First, the moving party may
produce affirmative evidence negating a material fact, thus demonstrating that the non-
moving party will be unable to prove its case at trial.  Once the moving party satisfies its
burden using this method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

*A. Vaxin and UAB*

Vaxin, Inc. is a small research development company which develops noninvasive vaccines.  (Van Kampen Dep. at 11; Van Kampen Decl. ¶ 3.)  Kent Van Kampen is the

---

[5] Facts are undisputed unless otherwise expressly noted.   If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See <u>Fitzpatrick</u>, 20 F.3d at 1115.

President and Chief Operating Officer of Vaxin.  (Van Kampen Dep. at 9.)  His duties include oversight of the company's day-to-day operations, administrative functions and financial operation, and some supervision of personnel.  (Id. at 9-10; Tang Dep. at 13.) Vaxin's corporate office is not located on UAB's campus.  (Van Kampen Decl.  ¶ 3.) Until 2003, Vaxin did not have more than 14 employees.  (Id. ¶ 11.)

The University of Alabama at Birmingham ("UAB") is a "35-year-old comprehensive, urban university and medical center that encompasses 82 city blocks and has student enrollment of 16,000."  UAB, The University of Alabama at Birmingham, Fast Facts, http://main/uab/edu/ show.asp?durki=66418 (as visited on March 3, 2005). UAB also has a large graduate school and more than seventy research centers.  See id. According to its website, UAB is the largest employer in the state.  See id.

Vaxin leases research space from UAB to operate laboratories on its campus. (Van Kampen Dep. at 11-12, 177.)  Both UAB and Vaxin's programs pertaining to vaccines operate in the same laboratory in Voller Hall.  (Id.)  Both Vaxin and UAB employees work on vaccine research in this laboratory.  (Id.)  Although the two entities sometimes work on common projects, they have separate ownership, personnel and equipment.  (Id. at 176.)

During all relevant time periods, Dr. De-chu Tang, who was jointly employed by Vaxin and UAB,[6] supervised all research in the lab and the day-to-day operations of the

---

[6] UAB paid forty-five percent of Tang's total salary and Vaxin paid the remaining fifty-five percent.  (Tang Dep. at 16.)

lab.  (Id. at 16, 177-78; Tang Dep. at 12, 15, 23.)  He assigned duties to both Vaxin and

UAB employees, and he had authority to evaluate the performance of both Vaxin and

UAB employees working in the lab.  (Tang Dep. at 19, 21-22.)  Tang is Vaxin's Chief

Technical Officer and Vice President.  (Id. at 10, 28-29.)  He was also an assistant

research professor at UAB.[7]  (Van Kampen Dep. at 30, 178.)  Dr. Craig Elmets, Chairman

of the UAB Department of Dermatology, supervised Tang in his role as a part-time

associate professor.  (Tang Dep. at 60.)  Elmets also acted as a consultant to Vaxin at one

time, but he was never employed by Vaxin.  (Van Kampen Dep. at 29.)  Tang reported to

both Van Kampen and Elmets, and his performance was evaluated by both Vaxin and

UAB.  (Tang Dep. at 24, 60.)

 Although Tang has general supervisory responsibility of all the employees in the

lab, he does not have authority to make significant employment decisions, such as hiring

and promotion, regarding Vaxin employees without Van Kampen's approval.  (Tang Dep.

at 13, 25-26.)  Although Tang could recommend a salary amount, Van Kampen

determined the salaries of all Vaxin employees.  (Id. at 59, 95-96.)  Van Kampen has

never been employed at UAB and does not oversee any UAB employees.  (Van Kampen

Decl. ¶ 4.)  Although Vaxin contends that no member of Vaxin management has authority

to promote, discipline, or terminate a UAB lab employee (id. ¶ 9), Cain submitted

---

[7] As of September 1, 2004, Tang was no longer employed by UAB because the Conflict
of Interest Board at UAB considered his employment with both Vaxin and UAB a conflict.
(Tang Dep. at 13-14.)

evidence that Felix Siegel, a Vaxin employee, placed a letter of reprimand in her file.
(Ex. 7 to Cain's Resp. to Mot. for Summ. J.)

### B. Plaintiff's Employment With UAB and Vaxin

Cain was employed by UAB from August 17, 1992 until February 11, 2000, in several positions and in several departments.  (Cain Dep. at 10-11, 14, 17-18.)  In February 2000, she resigned from UAB and accepted a position as a lab technician at Vaxin.  (Id. at 10-11.)  She interviewed with Tang and Van Kampen for the position.  (Id. at 102.)  As a Vaxin lab technician, Cain worked with Dr. Felix Siegel, a Vaxin research scientist.  (Cain Dep. at 72-73, 84.)  Her primary responsibility was research, but she, like the other lab technicians, she was given additional duties, such as ordering supplies or maintaining equipment.  (Id. at 85-87; Tang Dep. at 42-43.)  Cain's workload was not any heavier than that of the other technicians.  (Tang Dep. at 57-58, 113.)

On or about October 31, 2001, Cain resigned from Vaxin to return to her employment with UAB.  (Cain Dep. at 10; Exs. 9 & 10 to Cain Dep.)  Cain testified in her deposition that, even while she was employed with Vaxin, she wanted to return to UAB because UAB had better benefits.  (Cain Dep. at 153-54, 287-88.)  Cain returned to work with UAB on November 1, 2001 as a research assistant in the department of dermatology.  (Id. at 10.)  When she returned to work with UAB, she was assigned to work with Dr. Shanker Reddy, a UAB employee.  (Cain Dep. at 72, 90; Tang Dep. at 55; Van Kampen Dep. at 45.)

1.  Harassment by Dr. Reddy

Shortly after returning to her employment with UAB, in November 2001, Cain contends that Reddy, her immediate supervisor, committed approximately ten sexually offensive acts towards her.  (Cain Dep. at 299-304.)  She testified that Reddy touched her breast twice, rubbed her arm, rubbed her shoulder, and rubbed her leg on one occasion.  (Id. at 299-302.)  The first time Cain reported any of these incidents was after the second time Reddy allegedly touched her breast.  (Id. at 306-07.)  She did not report the previous actions earlier because she did not "realize that's [sexual harassment] what was going on."  (Id.)

Cain reported the behavior to Siegel, Van Kampen, and Tang.  (Cain Dep. at 303, 316; Van Kampen Dep. at 44-45.)  After Van Kampen spoke with Cain, he notified Tang so that UAB could address the complaint because Cain and Reddy were both UAB employees.  (Van Kampen Dep. at 46-48; Cain Dep. at 187-88; Tang Dep. at 135-36, 139, 146.)  Tang investigated Cain's complaint, and his immediate response was to remove Reddy as Cain's supervisor.  (Cain Dep. at 182-83, 192, 303-04; Tang Dep. at 149-51.)  According to Cain's own notes, she was removed from Reddy's supervision on or around December 14, 2001.  (Ex. 8 to Cain's Dep.)  Cain had no further problems with or complaints against Reddy.  (Cain Dep. at 304-05.)  Reddy resigned his position with UAB shortly thereafter.

Cain contends that Tang pressured her to not file a formal complaint regarding the alleged sexual harassment.  (Id. at 179.)  She also alleges that Tang's investigation of her allegations was inadequate.  She contends that Tang did not talk to other lab employees. (Id. at 149-50.)  She testified that Tang did not pay attention to sexual harassment policies and did not ensure that the policies were posted.  (Id. at 138-39.)  Tang testified that the first time he saw a Vaxin sexual harassment policy was on March 10, 2003.  (Tang Dep. at 143.)

## 2.  Lab Manager Position

Around December 2001 or January 2002, while she was employed with UAB, Cain contends that Tang told her that she would be promoted to lab manager.  (Cain Dep. at 92-91, 95.)  Cain alleges that Tang announced that she would be promoted to lab manager in a lab meeting during this time frame.  (Cain Dep. at 105-06, 193.)  She also contends that her job duties increased and she was asked to perform lab manager duties. (Id. at 87.)  Tang denies that he promised to promote Cain to lab manager.  (Tang Dep. at 115-16, 193.)  Tang did not discuss promoting Cain to lab manager with Van Kampen. (Van Kampen Dep. at 88.)  Tang did not have authority to create a lab manager position within Vaxin or to select anyone for the position without Van Kampen's involvement. (Van Kampen Decl. ¶ 17; Tang Dep. at 13.)

In early 2002, Vaxin created a new position, that of lab manager, to respond to the need for additional management support caused by the growth of Vaxin's lab work and

number of employees.  (Van Kampen Dep. at 87-88; Tang Dep. at 34, 117.)  The position

was posted on February 11, 2002.  (Ex. C to UAB's Motion for Summ. J.; Tang Dep. at

116; Van Kampen Dep. at 117.)  One qualification for the position was a Ph.D. in

molecular biology, virology, immunology, or a terminal professional degree.  (Ex. C to

UAB's Motion for Summ. J.; Cain Dep. at 274; Tang Dep. at 121-22; Ex. 5 to Tang Dep.)

Dr. Felix Siegel, who has a Ph.D. in biochemistry, applied for the position, and in

February 2002, Vaxin promoted  Siegel to the position of lab manager.  (Tang Dep. at

33,116; Van Kampen Dep. at 27; Van Kampen Decl. ¶¶ 13, 15.)  Siegel was selected for

the position because he applied, was qualified, and had a good record working with

Vaxin.  (Van Kampen Decl. ¶ 14.)

Sometime in 2002, Bob King, a Vaxin research assistant, was given responsibility

for managing some of the lab equipment and keeping the lab clean in addition to his

research work.  (Van Kampen Dep. at 92, 145-46; Cain Dep. at 211-12; Tang Dep. at 31-

32, 49-51, 201.)  King did not receive a pay increase for his additional duties.  (Van

Kampen Dep. at 146-47.)  Although Vaxin's brief states that King was never promoted to

a manager position in the lab, on September 17, 2002, Cain received an e-mail from Tang

stating that "Bob King has accepted the duty as manager in maintaining our UAB/Vaxin

labs at the GLP level."  (Ex. 3 to Pl.'s Brief in Opp. to Motion for Summ. J.)  Cain

contends that King took over some of her managerial duties after he was awarded the

11

position.  (Cain Dep. at 216-18.)  She also testified that King resigned the position, but continued his work as a lab technician.  (Id. at 214.)

During the relevant time period, there was never a lab manager position available in the UAB department of dermatology.  (Tang Dep. at 114.)  Tang testified that no such position existed at UAB.  (Id.)

### 3.  Plaintiff's First EEOC Charge

On January 4, 2003, Cain filed a charge of discrimination with the EEOC.  (Cain Dep. at 236-37; Ex. 9 to Cain Dep.)  Cain alleged that Vaxin discriminated against her based on her gender when it did not promote her to lab manager.  (Id.)  She also alleged that Vaxin's refusal to promote her was in retaliation for her complaint of sexual harassment against Reddy in November 2001.  (Id.)  Finally, she alleged for the first time that she was being sexually harassed by her male co-workers and required to work in a sexually hostile work environment.  (Id.)

Cain alleged that Siegel made offensive comments to her as early as January or February 2001.  (Cain Dep. at 161-64; Ex. 8 to Cain Dep.)  She contends that inappropriate behavior occurred on a regular basis, and that Siegel and King, both Vaxin employees, constantly told sexually offensive jokes, talked about sex, and made sexually offensive comments.  (Cain Dep. at 189-90, 201-02, 223-24, 227-28; Ex. 8 to Cain Dep.)  Although Cain knew that UAB had a harassment policy, was aware of the office that received harassment and discrimination complaints, and that Vaxin had a sexual

harassment policy and procedure, Cain never reported any of this alleged conduct to UAB or Vaxin before filing her charge of discrimination.  (Cain Dep. at 240-41; 252-54; 306-07; 320.)

4.  Vaxin's Sexual Harassment Training

On March 10, 2003, after Cain filed her EEOC charge, Vaxin conducted mandatory sexual harassment training and reviewed its policy against sexual harassment with the lab employees.  (Cain Dep. at 124-25, 128-29, 139, 157, 223.)  This training was for all lab employees, both Vaxin and UAB employees.  (Id. at 124; Pl.'s Ex. 5 to Brief in Opp. of Motion for Summ. J.)  At the training, the lab employees were given documentation regarding the legal guidelines on sexual harassment, prohibited conduct, complaint reporting procedures, program goals, program overview, and the legal definition of sexual harassment.  (Pl.'s Ex. 5 to Brief in Opp. to Motion for Summ. J.) They were also shown a video regarding sexual harassment.  (Id.)

Before this meeting, Tang had never seen documentation regarding Vaxin's sexual harassment policies.  (Tang Dep. at 142-43.)  Tang had never posted any Vaxin policies regarding sexual harassment and/or how to report sexual harassment before this meeting. (Id. at 143-44.)  Also before this meeting, the lab employees had never executed documentation to show that they had been given a copy of Vaxin sexual harassment policies.  (Id. at 148.)

13

After the training was conducted, Van Kampen asked Cain if there were any further inappropriate discussions in the lab, and she assured him that everything was fine. (Van Kampen Dep. at 116, 172-73; Cain Dep. at 262, 264, 280, 323-24.)  Cain testified in her deposition that after the training, "everything was okay."  (Cain Dep. at 136, 280.)  Tang also asked Cain how things were going in the lab, and she told him that things were okay.  (Id. at 259-60.)  Although Cain testified that three days after the sexual harassment training King made another inappropriate comment, she did not report it, even after a co-worker encouraged Cain to report it.  (Cain Dep. at 227-30.)  Cain did not complain to anyone at Vaxin that any inappropriate behavior continued after the training seminar.  (Cain Dep. at 136-40; 143-44; 157-58.)

### 5.  Plaintiff's Second EEOC Charge

On April 28, 2003, Cain filed a second charge of discrimination where she alleged continued harassment and retaliation.  (Cain Dep. at 140; Ex. 10 to Cain Dep.)  Vaxin conducted an investigation of the additional allegations made by Cain.  Dr. Charles Defesche, the CEO of Vaxin, and an outside investigator, investigated her contentions.  (Van Kampen Dep. at 21, 123.)  Siegel and King admitted that they and Cain had used "foul" language,  told "dirty jokes" which sometimes were sexually explicit, and made other inappropriate comments.  (Van Kampen Dep. at 97-98, 105-06, 108-09.)  Siegel and King stated that their friendship with Cain developed over time and that the three of them would frequently have lunch together.  (Id.; Tang Dep. at 163.)  They stated that this

14

conduct mainly occurred during these lunches.  (Id.)  Cain admits that she frequently had

lunch with Siegel and King, even though she contends that they sexually harassed her.

(Cain Dep. at 144-45, 308, 317.)  In her deposition, she denied or could not recall, telling

any dirty jokes or making sexual comments during her conversations with Siegel and

King.  (Id. at 121-23, 133.)  After the investigation, Siegel and King received written

reprimands which were placed in their personnel files.  (Id. at 120, 130-31, 154; Cain

Dep. at 135.)  Although the investigation also revealed that Cain also engaged in

inappropriate behavior, because Cain was not a Vaxin employee, she was not disciplined.

(Van Kampen Dep. at 120-21, 154-55, 162-63.)

    In July 2003, Van Kampen asked Cain how things were going in the lab, and she

responded that she had not experienced any additional sexual harassment, inappropriate

jokes, or inappropriate language.  (Van Kampen Dep. at 115, 172-73, 262; Cain Dep. at

136-38, 280.)  Cain testified in her deposition that inappropriate conduct by Siegel and

King completely stopped after they were reprimanded in May 2003.  (Cain Dep. at 135,

140-41, 260, 324.)

### IV. Applicable Substantive Law and Analysis

    Plaintiff's complaint contains the following claims against both defendants: (1)

sexual harassment in violation of Title VII; (2) sex discrimination in violation of Title

VII; and (3) retaliation in violation of Title VII.  The Board's motion for summary

judgment asserts that plaintiff cannot establish (1) sexual harassment based on a sexually

hostile work environment, (2) a prima facie case of gender discrimination under Title VII, and (3) a prima facie case of retaliation on her claim that she was denied a Lab Manager position.  Vaxin's motion for summary judgment asserts that there are no genuine issues of material fact regarding any of plaintiff's claims against Vaxin.[8]

### A.  Single Employer or Joint Enterprise Test

Before the court addresses each claim, the court must first decide whether the Board and Vaxin should be considered a single employer for purposes of liability under Title VII.  The Eleventh Circuit gives a liberal construction to the term "employer" under Title VII.  See McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir.1987); Williams v. City of Montgomery, 742 F.2d 586, 588 (11th Cir.1984).   The Eleventh Circuit instructs that the court should "sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's 'employer' comes within the coverage of Title VII."  Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1341 (11th Cir. 1999).

The Eleventh Circuit recognizes three theories under which multiple entities can be viewed in the aggregate.  Id.  First, where two seemingly separate entities are "highly integrated with respect to ownership and operations," the court may consider them a

---

[8] Vaxin also contends that, until 2003, it had less than fifteen employees, and, as such, it cannot be held liable for under Title VII for the actions of Siegel and King that occurred before 2003.

16

single employer under Title VII.  McKenzie, 834 F.2d at 933 (internal quotation omitted).

This test is the "single employer" or "integrated enterprise" test.  Lyes, 166 F.3d at 1341.

Second, where two entities contract with each other for the performance of some task,

and one company retains sufficient control over the terms and conditions of employment

of the other company's employees, the court may treat the entities as "joint employers."

See Virgo v. Rivera Beach Assocs., Ltd., 30 F.3d 1350, 1359-60 (11th Cir. 1994). This

test is the "joint employer" test.  Lyes, 166 F.3d at 1341.   Third, where an employer

delegates sufficient control of some traditional rights over employees to a third party, the

court may treat the third party as an agent of the employer and aggregate the two when

counting the number of employees.  See Williams, 742 F.2d at 589. This test is the

"agency" test.  Lyes, 166 F.3d at 1341.

It is undisputed that this case involves the "single employer" test.  To determine

whether two entities should be consolidated and counted as a single employer under this

test, the Eleventh Circuit applies the standard promulgated in NLRA cases by the

National Labor Relations Board.  See, e.g., McKenzie, 834 F.2d at 933.  This standard,

called the "NLRB test" requires the court to examine the following four criteria to

determine whether nominally separate entities should be treated as an integrated

enterprise: "(1) interrelation of operations, (2) centralized control of labor relations, (3)

common management, and (4) common ownership or financial control."  Id.  Although

not every factor needs to be present for the court to find that a single employer exists, and

no single factor is controlling, Lyes, 166 F.3d at 1341 n.5, the second factor is usually accorded greater weight than the others.  See Harriel v. Dialtone, Inc., 179 F. Supp. 2d 1309, 1312 (M.D. Ala. 2001); Fike v. Gold Kist. Inc., 514 F. Supp. 722, 726 (N.D. Ala.), aff'd 664 F.2d 295 (11th Cir.1981).

Under this test, Vaxin and UAB are not a "single employer."  First, there is no interrelatedness of operations.  Although Vaxin leases space from UAB to operate laboratories, they are separate business entities.  They do not share offices or have any involvement with each other's business or financial operations; they do not share accounting records, bank accounts, lines of credit, payroll processes, or personnel policies.  (Van Kampen Dep. at 11-12; Van Kampen Decl. ¶ 7.)  No officer or board member of either Vaxin or UAB serves as an officer or board member of the other entity.  (Van Kampen Decl. ¶ 8.) Cain has not produced any evidence that Vaxin or UAB controls the daily operations of the other.

Second, there is no centralized control of labor relations.  As noted above, this factor is often accorded more weight than the other three factors.  See Lyles, 166 F.3d at 1345.  To satisfy this requirement, one entity "must control the day-to-day employment decisions" of the other entity.  Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir. 1993).  UAB has a human resources office that handles all personnel issues.  (Cain Dep. at 45-46, 51, 288, 320.)  Van Kampen makes all significant employment decisions regarding Vaxin employees.  (Van Kampen Dep. at 19; Tang Dep. at 13, 25-27.)  Vaxin

18

supervisors evaluate Vaxin lab employees and UAB supervisors evaluate UAB employees. (Tang Dep. at 73-74; 85-86; 90-91.)

Finally, Cain has not presented any evidence of common management or common ownership and financial control. Although Tang was employed by UAB as a part-time professor, he was not a part of "management." Further, Van Kampen oversees all financial operations at Vaxin. (Van Kampen Decl. ¶ 9.) UAB has no financial control over Vaxin, or visa versa.

Cain argues that the court should consider them a single employer and provides a long list in her brief of supporting facts. (Br. In Opp. to Mot. for Summ. J. at 16-19.) Those facts, however, confuse the effect of Tang's joint employment with the single employer test. Although Tang was employed by both entities, his joint employment does not make Vaxin and UAB a single employer. Tang wears two hats in the lab; sometimes he wears the hat of a Vaxin employee, and at other times, he works as an employee of UAB. His joint employment does not convert UAB and Vaxin into a single employer.

The court finds that Vaxin and UAB are separate employers. The court, therefore, will separate the two employers in the following discussion of Cain's harassment and discrimination claims. It is undisputed that Cain was employed by UAB from 1992 until 2000; she was then employed by Vaxin from 2000 until October 31, 2001; she returned to UAB on October 31, 2001 and remains a UAB employee at the time of her complaint.

*B. Sexual Harassment*

19

Cain contends that she was subjected to sexual harassment by Shanker Reddy, a UAB employee who was her supervisor at the time of the alleged harassment.  She also contends that she was subjected to sexual harassment by two Vaxin employees, Felix Siegel and Bob King.  A claim for hostile work environment based on sexual harassment has five elements: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature, (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) a basis for holding the employer liable.  Mendoza, 195 F.3d at 1245.

"The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands."  Mendoza, 195 F.3d at 1245 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)).  This case does not involve such an explicit violation.  As such, plaintiff must prove that there were more than isolated incidents of simple teasing to establish a discriminatory change in plaintiff's terms and conditions of employment.  See Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ("conduct must be extreme to amount to a change in terms and conditions of employment"); Meritor Savings Bank, FSB v. Vinson,

20

477 U.S. 57 (1986).  An actionable hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993).   At the summary judgment stage, plaintiff does not have to establish that application of the Harris factors results in her prevailing on the merits; however, she does have to come forth with substantial evidence showing that a reasonable jury could potentially find for her at trial under this framework.

### 1.  UAB

The only allegations of sexual harassment that the Board could be held responsible for are the alleged actions of Reddy because it is undisputed that:  1) neither Siegel nor King was employed by UAB; and, 2) UAB had no control over them.  Reddy allegedly inappropriately touched Cain in November 2001, and she was removed from his supervision on December 14, 2001.  (Cain Dep. at 303; Van Kampen Dep. at 44-45; Ex. 8 to Cain's Dep.)  Cain testified that she had no further problems with Reddy after she was removed from his supervision.  (Cain Dep. at 182-83, 192, 304-05.)  Title VII plaintiffs have 180 days from the date of the alleged unlawful conduct to file a charge of discrimination.  See 42 U.S.C. § 2000e-5(e)(1).  Cain did not file a charge of discrimination until January 2003, more than a year after the alleged harassment.  (Cain Dep. at 236-37; Ex. 9 to Cain Dep.)  Cain's sexual harassment claim against the Board,

21

therefore, is time barred and summary judgment is due to be granted on this claim.  Nat'l

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122 S. Ct. 2061, 2070 (2002) ("A

claim is time barred if it is not filed within [this] time limit[ ].")  Because the hostile work

environment claim is time-barred, the court need not address her arguments that she

established a prima facie case of hostile work environment harassment.[9]

### 2.  Vaxin

Vaxin argues that Cain cannot establish a prima facie case of hostile work

environment because the conduct complained of was not "sufficiently severe or pervasive

to alter the working conditions of [her] employment and create an abusive working

environment."  Meritor, 477 U.S. at 67 (internal quotations omitted).  To determine

whether harassment was severe and pervasive to alter Cain's terms and conditions of

employment the court considers the following four factors: "(1) the frequency of the

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening

or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably

interferes with the employee's job performance."  Allen v. Tyson Foods, 121 F.3d 642,

647 (11th Cir. 1997) (citing and applying Harris, 510 U.S. at 23).  In addition, the

employee must meet both a subjective and objective test.  See Mendoza, 195 F.3d at

1246.  The employee must establish not only that she subjectively perceived the

---

[9] Even if the claim were not time barred, the alleged harassment was not "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment."  Meritor, 477 U.S. at 67.

environment as hostile, but also that a reasonable person would perceive the environment to be hostile and abusive.  Watkins v. Bowden, 105 F.3d 1344, 1355-56 (11th Cir. 1997). The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances.  Id.

The conduct alleged by Cain does not meet the minimum threshold of conduct sufficiently severe or pervasive to be actionable under Title VII.  Cain's brief contains a bullet-point list of fifteen alleged incidents of sexual harassment.  (Pl. Br. in Opp. to Motion for Summ. J. at 11-13.)  This list can be grouped in three categories: (1) dirty or sexual jokes and conversations about sexually explicit conduct and/ or sex organs; (2) calling Cain a "bitch" and yelling "fuck me"; and (3) derogatory comments about women in general.  (Id.)

The court first looks at the frequency of the comments. Cain recounted eight specific comments or conversations that involved sexually explicit conduct or sexual innuendos.  These comments occurred over an eighteen-month period, from mid-October 2001 until the end of April 2003.  Cain also alleged that the comments occurred on a "constant basis" and became worse over time.  Notwithstanding this general allegation, the record indicates that the comments were not particularly frequent.  Notably, Cain did not present any caselaw establishing that eight comments or conversations over an eighteen month period is sufficient to establish the "frequency" necessary to be actionable.  In addition, the court has been unable to find such law, and, instead, found

23

cases to suggest the opposite.  See Bussel v. Motorola, Inc., 141 Fed. App. 819, 823 (11th Cir. 2005) (unpublished opinion) (10 to 15 instances over a two-month period of rubbing against plaintiff's upper back was not severe and pervasive); Sprauge v. Thorn Ams., Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (five sexually-oriented incidents over sixteen months were sporadic).

As to the severity of the conduct, although the comments alleged by Cain are insensitive, rude and inappropriate, the comments are merely offensive utterances that would not have interfered with the work performance of an objectively reasonable person. Importantly, nothing in the record indicates that factors three (physically threatening) and four (unreasonable interference with work performance) are implicated. As to the third factor, Cain's allegations do not involve any physical conduct by Siegel or King. Although Cain contends that Siegel and King constantly told dirty jokes and made sexual innuendos, and that the conduct became worse over time, she presented no evidence that the conduct was physically threatening or humiliating.  (Cain Dep. at 130, 201.)  Instead, the conduct is merely "offensive utterances" which the Eleventh Circuit has consistently held insufficient to establish a severe and pervasive work environment.  See Gupta, 212 F.3d at 584.  Interestingly, Cain actually reported the alleged physical conduct of Reddy to Siegel, an individual who was supposedly harassing her during this same time period. In addition, she frequently had lunch with both Siegel and King.

As to the fourth factor, there is no evidence that the alleged harassment in any way interfered with Cain's job performance.  Instead, the two performance evaluations received by Cain during the relevant time period show that she "[f]requently exceeds [the] standard level of performance."  Moreover, in connection with her promotion claim, Cain argues that she had no problems in her position as a lab technician, and was so good at her job that she should have been promoted as a lab manager.

Allowing Cain's hostile environment claims to go forward would be dishonest to the longstanding proposition that Title VII is not a federal "civility code."  See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998).  Construing the facts in the light most favorable to plaintiff in the totality of the circumstances, the actions complained of by Cain were not sufficiently severe or pervasive to alter her terms or conditions of employment.[10]  See Mendoza, 195 F.3d at 1245-48.  Vaxin, therefore, is entitled to summary judgment as to this claim.[11]

*C. Discrimination*

---

[10] The court finds the Eleventh Circuit's survey of federal case law in Mendoza instructive.  Judge Hull, writing for an en banc court, surveyed hostile environment case law from across the circuits and concluded, as this court concludes, "[m]any decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this [case]."  195 F.3d at 1246-47.

[11] The court also has doubts as to whether the conduct was unwelcome.  It is undisputed that Cain continued to have lunch with Siegel and King.  The court questions whether an individual who believed that she was being sexually harassed by such comments would continue association with her alleged harassers on her own time.

In general, a plaintiff may establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial evidence, or statistics.  See Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  Here, plaintiff has presented only circumstantial evidence of gender discrimination.  "In evaluating claims supported by circumstantial evidence, [the court] use[s] the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."  Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[12]  See McDonnell Douglas, 411 U.S. at 802; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to

---

[12]  See also McDonnell Douglas, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

26

articulate a legitimate, nondiscriminatory reason for its actions.  See Combs, 106 F.3d at

1528.  The employer "need not persuade the court that it was actually motivated by the

proffered reasons."  Burdine, 450 U.S. at 254-55; see also Chapman, 229 F.3d at 1024.  If

the employer satisfies that burden by articulating one or more such reasons, then the

presumption of discrimination falls and the burden of production again shifts to plaintiff

to offer evidence sufficient for a reasonable jury to conclude that the employer's

supposedly legitimate reason is merely a pretext for illegal discrimination.  Although the

prima facie case is irrelevant once the employer has offered a legitimate reason for its

actions, the evidence of pretext may include the same evidence offered to establish the

prima facie case.  See Combs, 106 F.3d at 1528.

Despite the burden of production shifting between plaintiff and defendant under

the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at

all times with the plaintiff."  Burdine, 450 U.S. at. 253.  Given that the ultimate burden of

persuasion always lies with the employee, a plaintiff may defeat summary judgment either

by proving that intentional discrimination motivated defendant or by producing sufficient

evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate

reasons, thus permitting but not compelling the trier of fact to make a finding of illegal

discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49,

120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of evidence by plaintiff

will not always prevent the employer from prevailing on a Rule 50 motion and suggesting

that the strength of plaintiff's prima facie case, whether the probative value of the proof

that the employer's explanation is false, and any other properly considered evidence that

supports the employer's case are among other factors to take into account in evaluating a

Rule 50 motion);[13] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v.

Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d

1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the

post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th

Cir. 1993).

Cain alleges that the Board and Vaxin discriminated against her because of her sex

when she was not promoted to the position of Lab Manager.  To establish a prima facie

case of failure to promote, Cain must prove the following: "(1) she is a member of a

protected class; (2) she was qualified and applied for the promotion; (3) she was rejected

despite her qualifications; and (4) other equally or less qualified employees who were not

members of the protected class were promoted."   Wilson v. B/E Aerospace, Inc., 376

F.3d 1079, 1089 (11th Cir. 2004) (citing Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253

(11th Cir. 2000)).  The Board and Vaxin separately contend that Cain did not establish a

prima facie case of discrimination.  The court will address each defendant separately.

---

[13] The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

### 1. UAB

The Board contends that Cain cannot establish a prima facie case of failure to promote.  The court agrees.  It is undisputed that Cain is a member of a protected class.  Cain, however, cannot establish any other element of her prima facie case.  The simple reason why Cain cannot establish discriminatory failure to promote is because it is undisputed that the lab manager position was a Vaxin position, not a UAB position.  Cain has not presented any evidence to show that UAB ever had a job opening for a lab manager position.  Moreover, Cain did not present any evidence that she ever applied for a lab manager position with UAB or that she was qualified for such a position.  As such, the Board is entitled to summary judgment on Cain's claim of discriminatory failure to promote.

### 2. Vaxin

Vaxin contends that Cain cannot establish a prima facie case of discriminatory failure to promote because Cain was not qualified for the position and because she did not apply.  Although Cain's complaint and brief are unclear as to exactly which lab manager position she contends that she was not given because of sex discrimination, there were two potential positions that relate to this claim.  The first is the lab manager position created by Vaxin in early 2002, to respond to the need for additional management support caused by the growth of Vaxin's lab work and number of employees.  (Van Kampen Dep. at 87-88; Tang Dep. at 34, 117.)  The position was posted on February 11, 2002.  (Ex. C

to UAB's Motion for Summ. J.; Tang Dep. at 116; Van Kampen Dep. at 117.)  One

qualification for the position was a Ph.D. in molecular biology, virology, immunology, or

a terminal professional degree.  (Ex. C to UAB's Motion for Summ. J.; Cain Dep. at 274;

Tang Dep. at 121-22; Ex. 5 to Tang Dep.)  Siegel, who has a Ph.D. in biochemistry,

applied for the position, and in February 2002, Vaxin promoted  Siegel to the position of

lab manager.  (Tang Dep. at 33,116; Van Kampen Dep. at 27; Van Kampen Decl. ¶¶ 13,

15.)  Cain clearly was not qualified for this position as she does not have a Ph.D. in

molecular biology, virology, immunology, or a terminal professional degree.

Whether there was a second open lab manager position is in dispute. Vaxin argues

that "[d]uring the relevant time frame, Vaxin had no other vacant Lab Manager

positions."  (Vaxin Br. in Support of Motion for Summ. J. at 6) (footnote omitted).

Cain's deposition testimony is somewhat unclear as to whether there was another lab

position, but she submitted an e-mail from Tang stating that "Bob King has accepted the

duty as manager in maintaining our UAB/Vaxin labs at the GLP level."  (Ex. 3 to Pl.'s

Brief in Opp. to Motion for Summ. J.)  Examination of the other evidence in record,

however, shows that this position was not a true "lab manager" position, or even a

promotion from Cain's current position.

This position was created sometime in 2002, and given to Bob King, a Vaxin

research assistant.  King was given responsibility for managing some of the lab

equipment and keeping the lab clean in addition to his research work.  (Van Kampen Dep.

at 92, 145-46; Cain Dep. at 211-12; Tang Dep. at 31-32, 49-51, 201.) Cain contends that

King took over some of her managerial duties after he was awarded the position.  (Cain

Dep. at 216-18.)  She also testified, however, that "he [King] was announced as – in the

record that he would have a management position and he would perform some of the

duties that I was currently performing, but I don't think he officially got a management

title. . . .  I don't think that he filled out an application for lab manager or was given a job

title change officially."  (Id. at 276-77.)   Importantly, it is undisputed that King did not

receive a pay increase for his additional duties.  (Van Kampen Dep. at 146-47.)

The evidence, therefore, shows only that King was assigned some extra duties in

the lab.  Although the e-mail states that he "accepted the duty as manager," the record

evidence does not establish that this position included anything more than additional

duties.  Cain's testimony reaffirms this understanding of the record.  As such, Vaxin is

entitled to summary judgment on Cain's claim of failure to promote.

### D.  Retaliation

Cain claims that defendants retaliated against her for complaining of gender

discrimination when she was not promoted to the lab manager position.   Under Title VII,

it is "an unlawful employment practice for an employer to discriminate against any of his

employees or applicants for employment . . . because he has opposed any practice made

an unlawful employment practice by this [title], or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this [title]."  42 U.S.C. § 2000e-3(a).  Likewise, it is well established that

retaliation is a separate violation under Title VII.  See Gupta v. Fla. Bd. of Regents, 212

F.3d 571, 586 (11th Cir. 2000).  Thus, "plaintiff 'need not prove the underlying claim of

discrimination which led to her protest,' so long as she had a reasonable good faith belief

that the discrimination existed."  Meeks v. Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir.

1994) (quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1492, 1494

(11th Cir. 1989)).  Therefore, even where a plaintiff has failed to make a prima facie

showing of discrimination, she may still have a valid claim for retaliation.

To establish a prima facie case of retaliation, the plaintiff must show: (1) that she

engaged in protected activity; (2) that she suffered an adverse employment action and (3)

that there is a causal relationship between the protected activity and the adverse

employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).  Both the

Board and Vaxin separately contend that Cain did not establish a prima facie case of

retaliation.  The court will discuss each defendant separately.

### 1.  UAB

The Board contends that Cain cannot establish a prima facie case of retaliation.

The court agrees.  It is undisputed that Cain engaged in protected activity when she

complained of sexual harassment.  However, Cain cannot meet the second of her prong of

her prima facie case.  As discussed above, the lab manager position was a Vaxin position,

not a UAB position.  Cain has not presented any evidence to show that UAB ever had a

job opening for a lab manager position.  As such, UAB did not commit the adverse

employment action complained of by Cain.  The Board, therefore, is entitled to summary

judgment on Cain's claim of retaliation.


2.  Vaxin

Vaxin contends that Cain cannot establish a prima facie case of retaliation. In the

alternative, Vaxin contends that Cain "cannot establish that Vaxin's hiring him [Siegel]

based on his qualifications and track record is pretextual."  Cain arguably established a

prima facie case of retaliation. Although Cain complained about alleged sexual

harassment by an employee of UAB, Reddy, she complained to Van Kampen.  Van

Kampen then reported the incident to Tang for an investigation by UAB.  Vaxin does not

contend that this was not protected activity.  The court will assume, without deciding, that

her complaint is protected activity.  Cain also suffered an adverse employment action

when she was not promoted to the position of lab manager.  See  Walker v. Mortham, 158

F.3d 1177, 1187 (11th Cir. 1998).

This adverse employment action is arguably causally connected to her protected

activity.  To establish a causal connection between participation in a protected activity

and adverse employment action, "a plaintiff need only show that the protected activity

and the adverse action were not wholly unrelated." Brungart v. BellSouth Telecomms.,

Inc., 231 F.3d 791, 799 (11th Cir. 2000) (quotations omitted).  To make this showing, a

plaintiff must generally establish "that the decision maker was aware of the protected

conduct at the time of the adverse employment action." Id. "[C]lose temporal proximity

between the employee's protected conduct and the adverse employment action is

sufficient circumstantial evidence to create a genuine issue of material fact of a causal

connection." Id.  It is undisputed that Van Kampen, the decisionmaker, knew about her

complaint of sexual harassment.  Moreover, there is a close temporal proximity between

her complaint and the denial of the promotion; Cain complained of sexual harassment in

November 2001 and she was denied a promotion in February 2002.

Vaxin offered legitimate, nondiscriminatory reasons why it did not promote Cain

as lab manager: Cain did not apply for the position, and even if she had applied, she was

not qualified and Siegel was more highly qualified.  Under McDonnel Douglas, therefore,

Cain now has the responsibility of establishing pretext.  See Combs, 106 F.3d at 1528.

She must offer evidence sufficient for a reasonable jury to conclude that the employer's

supposedly legitimate reason is merely a pretext for illegal discrimination.

Cain argues, however, that the McDonnell Douglas burden-shifting analysis

applied to claims of employment discrimination was radically revised by the Supreme

Court in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148 (2003).  According to

Cain, Desert Palace overruled McDonnell Douglas and its progeny, so that "a district

court should deny summary judgment in Title VII cases when the plaintiff can establish a

34

prima facie case and establish that the discrimination was a 'motivating factor' in the adverse employment decision."  (Pl. Br. in Opp. to Mot. for Summ. J. at 37.)

The Eleventh Circuit has refused to read Desert Palace so broadly.  See Cooper v. Southern Co., 390 F.3d 695, 725 n.17 (11th Cir. 2004):

> While it is true that some courts have suggested that Desert Palace may spell the end of the McDonnell Douglas burden-shifting analysis, see, e.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987, 990-91 (D.Minn. 2003), the Desert Palace holding was expressly limited to the context of mixed-motive discrimination cases under 42 U.S.C. § 2000e-2(m).  Indeed, the Court explained that it did not decide whether its analysis applied in other contexts. Desert Palace, 539 U.S. at 94 n. 1, 123 S. Ct. at 2151 n. 1. Moreover, the fact that the Court did not even mention McDonnell Douglas in Desert Palace makes us even more reluctant to believe that Desert Palace should be understood to overrule that seminal precedent.  Finally, after Desert Palace was decided, this Court has continued to apply the McDonnell Douglas analysis in non-mixed-motive cases. See, e.g., Maynard v. Bd. of Regents, 342 F.3d 1281, 1289-90 (11th Cir. 2003).

Id.  Cain's argument, therefore, is without merit.

As additional evidence of pretext, Cain contends that Vaxin's reasons are not worthy of belief.  She asserts that she "was clearly performing the duties of a Lab Manager," that "Tang announced in a lab meeting that Plaintiff would be assuming the duties of Lab manager," and that there were no performance problems with Cain's work. (Pl. Br. in Opp. to Motion for Summ. J. at 34.)  These arguments do not come close to establishing pretext.  Cain did not even address the fact that she did not meet the minimum qualifications for the position or the vast disparity in qualifications between Siegel and Cain.  She has not pointed to anything in the record to even suggest that she

was denied this promotion in retaliation for her complaint of sexual harassment, and Vaxin is entitled to summary judgment as to this claim.

### V.  Conclusion

In summary, the court finds that no material issues of fact remain and that defendant The Board of Trustees of the University of Alabama at Birmingham and defendant Vaxin, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

**DONE**, this 30th day of September, 2005.

_Sharon Lovelace Blackburn_
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE